IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| JENNY WILSON, on behalf of herself and all others similarly situated,    )<br><br>Plaintiffs,    )<br><br>v.    )<br><br>GUARDIAN ANGEL NURSING, INC., a Tennessee Corporation; GUARDIAN ANGEL NURSING, INC., a Mississippi Corporation; ON-CALL STAFFING OF TENNESSEE, INC., and ON-CALL STAFFING, INC.; LEAWOOD, INC.; E.L. GARNER, JR.; and E.L. GARNER, III,    )<br><br>Defendants.    ) | No. 3:07-0069<br>Judge Nixon<br>Magistrate Judge Bryant |

## MEMORANDUM ORDER

Pending before the Court are the parties' cross-motions on the question of summary

judgment. Defendants have filed a Motion for Summary Judgment ("Motion for Summary

Judgment") (Doc. No. 130), a Memorandum in Support (Doc. No. 137), and Undisputed Facts in

Support ("Undisputed Facts") (Doc. No. 131). Plaintiff Jenny Wilson and, at present, 72 others

who have opted-in to this litigation ("Plaintiffs") have filed their own Motion for Partial

Summary Judgment (Doc. No. 133), a Memorandum in Support (Doc. No. 135), and a Statement

of Material Facts As to Which There Is No Genuine Issue for Trial in Support ("Statement of

Material Facts") (Doc. No. 134).

There have been two rounds of responsive pleadings. In the first round, Plaintiffs filed a

Response to Motion for Summary Judgment (Doc. No. 151) and a Memorandum in Support

Case 3:07-cv-00069   Document 189   Filed 07/31/08   Page 1 of 40 PageID #: 1625

(Doc. No. 158), as well as a Response to Defendants' Undisputed Facts in Support of Motion for

Summary Judgment and Plaintiffs' Statement of Additional Material Facts (Doc. No. 153).

Defendants filed a Responsive Memorandum in Opposition to Plaintiff's [*sic*] Motion for Partial

Summary Judgment (Doc. No. 154), Additional Facts in Response to Plaintiff's [*sic*] Motion for

Partial Summary Judgment ("Additional Facts") (Doc. No. 155), and a Response to Plaintiffs'

Statement of Material Facts (Doc. No. 159).

In the second round, Plaintiffs filed a Response to Defendants' Additional Facts in

Response to Plaintiffs' Motion for Partial Summary Judgment (Doc. No. 160) and a Reply to

Response to Motion for Partial Summary Judgment (Doc. No. 161). Defendants filed a response

to Plaintiff's Statement of Additional Material Facts. (Doc. No. 164).

For the reasons set forth herein, Defendant's Motion for Summary Judgment is **DENIED**

and Plaintiffs' Motion for Partial Summary Judgment is **GRANTED in part**.


I.      **BACKGROUND**

        A.      **Procedural Background**

        On January 18, 2007, Joanie Christie filed a Complaint (Doc. No. 1) against Defendant

Guardian Angel Nursing, Inc., a Tennessee corporation. On February 23, 2007, Plaintiff Jenny

Wilson opted-in to this action as a representative plaintiff and filed an Amended Complaint

(Doc. No. 4) which added Guardian Angel Nursing, a Mississippi corporation, On-Call Staffing

of Tennessee, Inc., and On-Call Staffing as Defendants. Those four (4) Defendants filed an

Answer (Doc. No. 10) on March 30, 2007. Plaintiffs filed a Motion to Amend/Correct

Complaint (Doc. No. 61) on July 20, 2007, which was granted by Magistrate Judge John S.

-2-

Bryant (Doc. 72) on August 2, 2007. Plaintiffs then filed a Second Amended Complaint (Doc. No. 73) the same day, August 2, 2007, adding Leawood, Inc., Friendship Home Health, LLC, E.L. Garner, Jr., and E.L. Garner, III, as defendants. On August 8, 2008, Plaintiffs filed a Motion to Amend Complaint to Correct Clerical Error (Doc. No. 74), which was granted by Magistrate Judge Bryant on August 10, 2007 (Doc. No. 75), and Plaintiffs filed their Third Amended Complaint (Doc. No. 76) on the same day. The Third Amended Complaint reflected the fact that Joanie Christie was voluntarily dismissed from this lawsuit on March 7, 2007. Id.; see (Doc. Nos. 6, 75). Friendship Home Health, LLC was voluntarily dismissed without prejudice on September 13, 2007. (Doc. No. 92).

Plaintiffs allege violations of the overtime provisions of the Fair Labor Standards Act ("FLSA" or "Act"). 29 U.S.C. § 207. (Doc. No. 76). They seek overtime backpay under § 207, an equal amount of liquidated damages under § 216(b), and attorney's fees under § 216(b). Jurisdiction is proper in this Court under 28 U.S.C. § 1331.

### B.    Factual Background[1]

#### 1.    *Defendants*

Defendants are a single business entity that places trained nurses in private homes and medical facilities on an as-needed basis. Defendants' main office is located in Batesville, Mississippi. Defendants have other office locations in Memphis, Maryville, Manchester, and Lebanon, Tennessee. Each office acts as a hub which coordinates nursing services in the

---

[1] All facts in this section are undisputed unless otherwise notes. Facts are taken from Defendants' Undisputed Facts (Doc. No. 131), Plaintiff's Statement of Material Facts (Doc. No. 134), Plaintiff's Response to Defendants' Undisputed Facts and Plaintiffs' Statement of Additional Material Facts (Doc. No. 153), Defendants' Additional Facts (Doc. No. 155), Defendants' Response to Plaintiffs' Statement of Material Facts (Doc. No. 159), Plaintiffs' Response to Defendants' Additional Facts (Doc. No. 160), and Defendants' Response to Plaintiff's [*sic*] Additional Material Facts (Doc. No. 164), unless otherwise cited.

surrounding area.  However, Defendants provide nursing services across a geographic region that extends significantly beyond Tennessee and Mississippi; Defendants maintain a list of nurses in Tennessee, Mississippi, Kentucky, Louisiana, Ohio, Alabama, and Arkansas.

The working arms of Defendants' business are On-Call Staffing of Tennessee, Inc., a Tennessee corporation, and On-Call Staffing, Inc., a Mississippi Corporation (collectively, "On-Call").  The two Guardian Angel Nursing, Inc., Defendants – one a Tennessee corporation, the other incorporated in Mississippi (collectively, "Guardian Angel") – are now dormant, their business being conducted through the respective On-Call branches.  Defendant Leawood, Inc. was incorporated in Mississippi.  Its vitality is in dispute.[2]

Defendant E.L. Garner, Jr. ("Mr. Garner") is at the helm of the business enterprise.  His two sons, Dee Garner, and Defendant E.L. Garner, III ("Mr. Garner, III") run the day-to-day operations.  Dee Garner is the company's operations manager.  Mr. Garner, III oversees operations for the Memphis, Tennessee location.  He has held this position since at least the spring of 2007, but perhaps since June of 2006; the evidence is conflicting on this point.[3]  Mr. Garner, III is also the lone shareholder and President of each of the Defendant corporations.

_____

[2] Defendant Leawood, Inc. ("Leawood") has asserted in a Motion to Dismiss (Doc. No. 79) that it is not properly subject to suit because it was dissolved in 2001 and has been inactive since 1999. See (Doc. No. 79 and Attach. Ex.).  Plaintiffs argue that Leawood remained active as late as February 26, 2007, as evidenced by a memorandum sent on that date from Leawood to "All Independent Contractors" stating that On-Call had contracted payment of all independent contractors to Leawood as of January 1, 2007. See (Doc. No. 83 and Attach. Ex. 1).

Attached to Leawood's Motion to Dismiss were documents outside of the pleadings, and this Court accordingly treated the motion as one for summary judgment. See (Doc. No. 179).  Following Federal Rule of Civil Procedure 12(d), the parties were given additional time to file facts pertinent to disposition of that motion.  Leawood's converted Motion for Summary Judgment remains pending.  The fact that Leawood's Motion to Dismiss has not been resolved does not preclude the Court's decision in this Order.

[3] Mr. Garner, III testified that he began work for On-Call in Memphis starting in either June or July of 2006.  (E.L. Garner, III Dep. 53:8).  However, affidavits from both he and Mr. Garner state that Mr. Garner did not work for and had no authority within Defendants' companies before the spring of 2007.  (E.L. Garner, Jr. Aff. 4); (E.L. Garner, III Aff. 3).

-4-

Defendant corporations have no other corporate officers. Mr. Garner speaks to his sons on a daily basis about the running of the business, offering counsel and making executive decisions where necessary.

Mr. Garner became involved in the business of private duty nursing in April, 1984 by financing and setting up Premier Nursing. Also in the mid-1980's, he founded a nurse-staffing company called Associated Nursing.

In 2002, Mr. Garner created Guardian Angel, which placed nurses in homes and medical facilities until January 5, 2005. On that date, the Tennessee Department of Licensure issued a Cease and Desist Order to Guardian Angel stating that the company could not lawfully provide nursing services without a Certificate of Need (CON), which Guardian Angel did not possess. Defendants circumvented this obstacle in two steps. First, On-Call was established in Mississippi and Tennessee in March, 2005, to assume the business of Guardian Angel. Second, because On-Call did not have a CON, On-Call established contractual associations with Home Health Agencies ("HHAs") like Friendship Home Health and Cumberland River. HHAs have CONs and so are permitted to provide private duty nursing services under Tennessee law. By contracting with HHAs, Defendants were able to continue doing business through On-Call in essentially the same manner as they had through Guardian Angel, with the technical distinction that they were doing business under the umbrella of the HHAs. For this benefit, Defendants pay the HHAs a substantial percentage of their profits. The HHAs with which Defendants associate play no role in the running of Defendants' business. Mr. Garner likened the role played by in Defendants' business to the circumstances of "signing off on law papers and you have to go across the street and get another lawyer to sign off with you." (E.L. Garner, Jr. Dep. 24:4-6).

The personnel responsible for operation of Defendants' business are classified as follows. Marketers and Staffers work out of one of Defendants' offices. Marketers assist Mr. Garner in soliciting business. Staffers are individuals who coordinate and oversee the staffing of clients with nursing services. Both Marketers and Staffers are treated as "employees" by Defendants within the meaning of the FLSA: they are paid overtime for any hours worked over 40 per week. The remainder of Defendants' office personnel are either Human Resources or part of the management hierarchy; the total number of office employees – between all of Defendants' offices – is less than 80. The majority of Defendants' personnel are nursing staff who work in the field. Defendants' business incorporates approximately 15 Registered Nurses (RNs), 100 Certified Nursing Assistants (CNAs), and between 500-750 LPNs. Defendants treat around three (3) RNs as "employees" within the meaning of the FLSA; all other nurses are classified by defendants as "independent contractors."

### 2. *Plaintiffs*

Plaintiffs are 73 licensed practical nurses ("LPNs") who performed in-home, or "private duty," continuous care nursing under contract with Defendants. To become an LPN, an individual must complete a one-year nursing program and pass a three (3) hour National Council Licensure Examination (NCLEX) with a score of 80 or better. After passing the exam, an individual is licensed as an LPN within the state that the exam was administered. LPNs are generally considered more skilled than CNAs, but less skilled than RNs.

LPNs such as Plaintiffs come to work for Defendants in the following manner. First, an individual LPN contacts Defendants and expresses interest in working for On-Call. On-Call then sends an application packet to the LPN which contains an extensive list of materials for the LPN

-6-

to review, as well as forms to be completed and returned. Included among these materials are an Employee Code of Conduct, a Nurse's Skills Checklist, an Independent Contractor Agreement, and a Contractor's Statement of Understanding.

Next, interested LPNs must complete and return application materials, provide proof of professional liability insurance or apply for same, and send in a copy of their driver's license, nursing license, social security card, proof of tuberculosis ("TB") skin test, and proof of cardiopulmonary resuscitation ("CPR") certification. If an LPN returns all of the necessary paperwork, On-Call verifies the validity of the LPN license, TB skin test, and CPR certification, and then conducts a background check for previous felonies as well as a reference check with previous employers. An LPN must also pass an In-Service Test which examines proficiency in matters of basic nursing. Once each of Defendants' requirements in these regards is satisfied, an LPN is placed on the "active list."

LPNs on Defendants' active list are not yet working for Defendants. LPNs come to earn a paycheck from Defendants in the following manner. First, Defendants acquire a new client requiring private duty nursing, either from an HHA with whom Defendants have contracted, from an insurance company, or directly from the client. The client has already been prescribed private duty nursing by this point, and Defendants receive detailed information about the care the client requires as signed by a physician. The care prescribed a patient by a medical doctor is referred to as the Form 485.

The work required of LPNs on private duty detail depends greatly on the particularities of the individual client and the Form 485. All LPNs must perform certain rudimentary health care functions, such as making assessments at the beginning of a shift and assisting with feeding,

-7-

elimination, medication, and hygiene, where necessary. But the Form 485 may vary widely across clients. Plaintiff Jenny Wilson ("Ms. Wilson") provides just one example. During her tenure with On-Call, she worked with a pediatric patient who required 24/7 monitoring of respiratory, musculoskeletal, gastrointestinal, endocrinal, mental, and integementary (skin) status, as well as monitoring of signs and symptoms of infection. Ms. Wilson learned the requisite skills for this work in nursing school, as is the case for all of the work done by Defendants' LPNs. Defendants neither provide nor reimburse for any training for LPNs. In fact, LPNs are expected to maintain the necessary accreditations to remain practicing LPNs independently. This includes maintenance of CPR accreditation, personal liability insurance, LPN licensure, and compliance with continuing education requirements.

LPNs are also expected to provide their own supply of basic nursing equipment, including a uniform, scissors, stethoscope, thermometer, and blood pressure cuff. Many of these items are provided to LPNs in nursing school, but in any event, the sum total of these items is less than $45. Any more expensive medical equipment, such as a ventilator or computerized monitoring device, is provided by the client or their insurer, as necessary.

The tenure of LPNs with Defendants' companies varies significantly. Ms. Wilson worked with On-Call from June 16, 2006, to August 20, 2006 – approximately 10 weeks. Other LPNs stay longer. Because the evidence suggests that Guardian Angel came into existence in 2002, and because the present suit was initiated in 2007, approximately five (5) years would seem the upper boundary for an LPNs tenure with Defendants' business.

LPNs also work divergent hours in a given week. About half of all LPNs work at least four (4) 12-hour shifts per week for a 48-hour work week. Of that half, many work 60-80 hours

-8-

per week. Ms. Wilson often worked 100 hour weeks during her time with On-Call.

Approximately half of all LPNs, however, work an average of less than 40 hours per week

### 3. *The Working Relationship Between Plaintiffs and Defendants*

LPNs on the active list must, by virtue of completing the Independent Contractor

agreement ("ICA") and Contractor's Statement of Understanding, agree to a number of

conditions regarding their work for Defendants. First and foremost, LPNs stipulate that they are

"independent contractors," not "employees," that provide care in accordance with their own

judgment, and who take direction in the course of their work only insofar as Defendants require

on behalf of their contractual partners, whether HHAs or individual clients:

> As an independent contractor, Contractor shall determine,
> according to his/her professional judgment, expertise, and
> discretion, his/her own method of operation and the manner, order,
> and sequence in which the Services will be performed for the
> Client(s), and shall (a) complete all such Services in the highest
> professional manner consistent with applicable medical practices
> and procedures, clinical guidelines, and legal and ethical
> considerations, as well as consistent with On-Call Staffing and/or
> the Client's standards and specifications, and (b) within a
> reasonable period of time, comply with any requests concerning
> the performance of the Services to On-Call Staffing's satisfaction.
> It is expressly understood that any such requests are for the sole
> purpose of performing the specific Services requested to ensure
> satisfactory completion of same, and are not intended to amend or
> alter this Agreement in whole or part.

(Doc. No. 138 attached Exhibit 1 at 1).

The ICA also speaks to the compensation paid to LPNs. LPNs are not entitled to

overtime, receive no benefits, and have no taxes withheld. (Id. at 4-5). In short, LPNs agree to

flat-rate, straight-time compensation. LPNs are prohibited from contracting with or taking

money directly from clients.

-9-

LPN's are specifically authorized to engage in other work, including nursing services, by the "Non-exclusivity" provision of the ICA. (<u>Id.</u> at 5). Indeed, it is common in the industry and among those contracting with Defendants to work for more than one nurse staffing agency or HHA. However, this allowance is limited by the "Non-Competition/Non-Solicitation Covenant" provision of the ICA: LPNs are not permitted to compete for the service of any client or employee of Defendants for a period of one (1) year after working for Defendants. (<u>Id.</u> at 6-7).

The scheduling of LPNs is the work of Defendants' Staffers. Defendants assign each new client to a Staffer, and Staffers generally handle a number of cases, but not more than 15. For each incoming case, the Staffer reviews the active list for LPNs in the area whose skills match those required for the individual patient. The Staffer then calls any matching LPNs and describes the assignment, as well as the compensation. The hourly compensation which Defendants offer to LPNs may vary from case to case, depending on which HHA is involved and the skills required. In some circumstances, an LPN may successfully negotiate a higher rate of pay than that originally offered by Defendants, particularly where an assignment would entail considerable travel. Generally, the bookends for compensation are $18 and $25 per hour. An LPN who is offered shifts by Defendants is under no obligation to accept. An LPN may refuse the work unconditionally, make special requests as to which shifts are most desirable, or condition acceptance upon meeting and approving of the client and the client's family. Once an LPN accepts shifts with a particular client, a meeting is arranged between the LPN, the client, and the client's family. If all are agreeable to the arrangement, an LPN may begin to work for pay thereafter.

Once all the shifts are filled for a particular client, the assigned Staffer draws up a

monthly schedule which is faxed to the home of the client. All changes to the schedule must go through the Staffer. Some LPNs consider the Staffer assigned to their client to be their "supervisor." If an LPN cannot report for a shift, the LPN must notify the Staffer assigned to the client no less than three (3) hours before the shift begins. If an LPN wishes to swap or dump a shift and finds another LPN willing to cover, the substitution must be approved by the Staffer. In the event that an LPN on duty is not relieved by an incoming nurse as dictated by the schedule, the LPN may not leave the client unattended. In some cases, taking the case of Ms. Wilson as an example, this policy may require an LPN to remain on duty for as long as 48 hours at a stretch. Failure to comply with Defendants' scheduling policies may result in an LPN's removal from the active list, which amounts to termination. Defendants remove an average of two (2) to three (3) LPNs from the active list each month.

Working LPNs are required to remain in nearly constant contact with Defendants. LPNs are not required to come into any of Defendants' offices, and rarely do so. Telecommunication from the clients' homes to Defendants' offices is thus paramount.

LPNs complete Nurse's Notes (NNs) on an hourly basis and fax them in to the appropriate On-Call office. LPNs are also required to submit their NNs twice a week by mail; Defendants then check to make sure that the faxed and mailed copies match. This serves to insure that LPNs are working their scheduled shifts and providing the prescribed care. LPNs must also submit time sheets indicating their hours worked. If time sheets and NNs are not submitted with respect to a particular shift or hour, an LPN is not paid for that time. Defendants also ascertain how LPNs are performing in the course of conversations between Staffers and the client's family, which occur on an almost daily basis.

-11-

Defendants also require that LPNs complete and fax to Defendants' offices any number of forms that correspond to the condition of the particular client and events which may occur during a given shift. These forms include Intake and Outtake Vital Sign Sheets ("I&O's"), where the LPN details anything consumed or eliminated by the client, Respiratory Care and Control Substance Sheets, Medication Administration Record ("MAR") Forms, Narcotic Flow Sheets, Diabetic Flow Sheets, Seizure Report Sheets, Infection Control Sheets, Occurrence Reports, CNT Assessment Sheets, and CNT Notes.[4] In essence, Defendants require LPNs to document with specificity any matters of interest that may occur during the course of a shift. All of the materials necessary for this communication – forms, fax machines, ink cartridges, etc. – are provided by Defendants and stored in the homes of clients. LPNs are required to submit a Supply Request Sheet if any paper or fax supplies are running low. See (Doc. No. 138 attached Exhibit 46).

Defendants also proactively monitor the work done by LPNs. Under Tennessee state law, Defendants are required to send an RN to the home of a client every 30 days to insure that the LPN is performing the prescribed care properly. Defendants employ approximately three (3) RNs for this purpose. This requirement, however, was not put into place until around May, 2007. Ms. Wilson, who left On-Call in 2006, never met an RN face-to-face in her two (2) months working in a client's home. On one occasion, she received a telephone call from an RN inquiring as to whether there had been any changes in the client's medication.

---

[4] It is not clear from the factual record what sort of information LPNs are expected to convey on all of these forms. For instance, "CNT" is not defined in any deposition or affidavit. However, regardless of such ambiguities, the Court is able to glean from the factual record that Defendants require LPNs to document and inform Defendants of all aspects of their shifts and to make special note of any medical conditions or events. This much is undisputed.

-12-

In addition, Defendants send LPNs company memorandum which cover a range of subjects. Memoranda sometimes address administrative concerns, requiring LPNs to submit updated nursing license, TB skin test, or CPR card information. (Doc. No. 138 Attach. Ex. 30). Others concern the manner of payment (Doc. No. 83 Attach. Ex. 1) and procedure for resolving payment issues (Doc. No. 138 Attach. Ex. 33). Most common are correspondences addressing the paperwork which LPNs are required to submit in conjunction with their shifts. Memoranda frequently insist that LPNs turn in notes or forms regularly and in accordance with certain specifications, often those of the relevant HHA. See (Doc. No. 138 Attach. Exs. 32, 34, 36, 42, 44). Some memoranda chastise the LPNs for improper behavior on the job, such as smoking in the client's house, failure to bathe clients who resist bathing (Id.), or sleeping during working hours (Doc. No. 138 Attach. Ex. 31). The tone of these reprimands is frequently one of urgency, frustration and condescension; memoranda contain regular use of all-caps (Id.) ("TERMINATION"); (Doc. No. 138 Attach. Ex. 30) ("UNACCEPTABLE"; "THIS IS MANDATORY") and exclamations points (Id.) ("This will not be taken carelessly!"; "This must begin **immediately!**"; "THIS IS NOW MANDATORY!") (emphasis in original); (Doc. No. 138 Attach. Ex. 31) ("There is no sleeping while you are working!").

Defendants also outfit every client's home with both a Policy and Procedure Manual ("P&PM") and a Procedure Manual for Pediatric Patients ("PMPP"). The P&PM is 344 pages long and contains detailed information on the role of the LPN in the company, policies regarding virtually all aspects of LPN work, and a detailed explanation of the proper way to perform an extensive list of medical procedures. (Doc. No. 138 Attach. Ex. 21). The PMPP details with specificity the proper manner of performing many types of procedures on pediatric patients. The

-13-

parties are in agreement that the P&PM and PMPP are placed in the homes of clients for the benefit of LPNs. However, beyond this threshold fact, the purpose of these manuals is very much in dispute.

Defendants contend that the manuals are simply a resource for the LPNs to refer to in case they need to perform a procedure with which they are unfamiliar or out of practice. Many of the procedures may be performed in a number of ways which are equally satisfactory, and Defendants claim that the manuals do not require LPNs to use the precise methods listed in the manuals if they prefer a suitable alternative. Defendants maintain that the contents of the manuals - in both the policies and procedures sections - were lifted almost wholesale from Tennessee state government websites and other online resources, and that the manuals therefore do not represent an authoritative statement of carefully reasoned tenets of Defendants' business.

Plaintiffs argue to the contrary that both manuals state unequivocally that LPNs are expected to study the manuals and comply with the policies and procedures therein verbatim. Plaintiffs' interpretation comes from the text of the manuals themselves. In the introductory "Welcome," the P&PM states, "[w]e have outlined in this manual an explanation of policies and procedures that apply to all who work within our company. Please study this manual carefully and keep it for future reference." (Depo. Ex. 21). The "Purpose of Policy and Procedure Manual" section states that the manual was written "to inform you as to what you can generally expect from our organization and what we expect from you." (Id.). Plaintiffs also note that the policy section of the P&PM regulates all aspects of LPN work and conduct in the home of clients. For instance, LPNs are forbidden from wearing excessive "body spray, perfume, or cologne." (Id. at 5). LPNs are warned that "[d]isobedience or insubordination to supervisors . . .

-14-

will constitute disciplinary action and may result in immediate termination." (Id. at 7). The length of LPN meal times and rest periods is strictly defined and susceptible to extension only at the discretion of the LPNs "supervisor and/or administrator." (Id. at 8). Personal relationships with clients or their family members "which conflict with, detract[] from, or adversely affect[] the interest of the agency [Defendants]" must be avoided or reported to Defendants. (Id.). In all, the Employee Code of Conduct contains 44 such rules, the violation of which may result in the sanction or termination of an offending LPN. (Id. at 9).

Plaintiffs also argue that both manuals list only one method for performing any given procedure, and that there is nothing in either of the manuals to support the Defendants' contention that LPNs are free to use the method of their choice.

### 4. *Defendants' Knowledge of the FLSA*

In 1984 or 1985, Defendant Mr. Garner, sought the help of an attorney in drafting a contract that would be binding as to all of the nurses with whom Mr. Garner intended to contract. Mr. Garner told the attorney how he intended to run his business, and the attorney drafted the ICA which Defendants have used, unchanged, since that time. At the time of his deposition, Mr. Garner could not recall the name of the attorney with whom he consulted in 1984 or 1985. (E.L. Garner, Jr. Dep. 86:4-5). Shortly after the ICA was drafted, Mr. Garner brought it to a judge[5] who assured Mr. Garner of the attorney with whom Mr. Garner had consulted, "that's his specialty. You'll just have to go with that." (E.L. Garner, Jr. Dep. 82:16-17). Defendants have never contacted another attorney to discuss the ICA or the legality of their compensation of

---

[5] The judge is referred to only as "Judge McKenzie" in the segment of Mr. Garner's deposition as filed with the Court. (E.L. Garner, Jr. Dep. 82:15). The jurisdiction of this judge is not known by the Court.

-15-

nurses.

In 2005, Defendants entered into an agreement with HHA Friendship Home Health ("Friendship") to purchase 50% of Friendship and assume responsibility for payment of Friendship's nurses. At the same time, Friendship was being sued by the Department of Labor ("DOL") for violation of the FLSA for failure to pay overtime to its nurses. As a result of that suit, Friendship entered into a settlement and awarded backpay to its nurses. Just before finalizing a transaction with Friendship, Mr. Garner asked the CEO of Friendship, Theo Egbujor ("Mr. Egbujor"), "if I get ready to exercise and if I'm able to exercise the option to buy 50 percent of your company, Friendship, there are no liens or any lawsuits out there, are there?" (E.L. Garner, Jr. Dep. 51:13-16). Mr. Egbujor responded that Friendship had indeed been sued by the DOL and that the matter was still pending. However, Mr. Egbujor assured Mr. Garner that the suit would be resolved by the end of the year and that Mr. Garner had nothing to worry about. Mr. Garner was told nothing further and asked no further questions.

Throughout the time period that Defendants have been in business, LPNs with whom Defendants contracted have occasionally filed for unemployment benefits. Each time, LPNs were denied benefits based on the Tennessee Employment Security Division's ("ESD"'s) finding that LPNs were independent contractors, not employees of Defendants.

After the filing of this suit in 2007, Dee Garner received an email from Defendants' previous attorneys relaying information from the Wage and Hour Division of the DOL. The Wage and Hour Division representative informed Defendants' prior counsel that the DOL was having difficulty classifying Defendants' nurses under the FLSA and had yet to reach a decision as to whether they were employees or independent contractors.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate when there is "no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). Generally, summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Canderm Pharmacal, Ltd. v. Elder Pharm., Inc., 862 F.2d 597, 601 (6th Cir. 1998) (quoting FED R. CIV. P. 56(c)). All the facts and the reasonable inferences to be drawn from those facts must be viewed in the light most favorable to the non-moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

In order to succeed, the moving party must show that there is an absence of evidence to support the non-moving party's case and that "the evidence is so one-sided that one party must prevail as a matter of law." Lexington-South Elkhorn Water Dist. v. City of Wilmore, 93 F.3d 230, 233 (6th Cir. 1996). Mere allegations of a factual dispute are not sufficient to defeat a properly supported motion for summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). A genuine issue of material fact is one which, if proven at trial, would lead a reasonable fact finder to find in favor of the non-moving party. Id. at 247-48. The substantive law involved in the case will underscore which facts are material and only disputes over outcome-determinative facts will bar a grant of summary judgment. Id. at 248.

## III.    DISCUSSION

Defendants seek summary judgment on four grounds: (1) Plaintiffs were not "employees"

-17-

but "independent contractors", and so are not entitled to overtime backpay under the FLSA; (2) Defendant Mr. Garner, III, exercised no authority to correct an FLSA violation and so is not properly subject to individual liability; (3) in the alternative, Defendants acted in good faith and so should not be subjected to liquidated damages under 29 U.S.C. § 260; and (4) in the alternative, Defendants' violation of the FLSA was not willful such that the statute of limitations should be set at two (2) instead of three (3) years under 29 U.S.C. § 255(a).[6] (Doc. No. 137).

Plaintiffs seek partial summary judgment on two grounds: (1) Plaintiffs were "employees" within the meaning of the FLSA; and (2) all Defendants are liable under the FLSA. (Doc. No. 135).

### A. Whether Plaintiffs Were "Employees" or "Independent Contractors"

On the question of whether Plaintiffs were "employees" or "independent contractors" within the meaning of the FLSA, "summary judgment may be appropriate, because the question '[w]hether a particular situation is an employment relationship is a question of law.'" Imars v. Contractors Mfg. Servs., Inc., 1998 WL 598778 at *3 (6th Cir. 1998) (quoting Fegley v. Higgins, 19 F.3d 1126, 1132 (6th Cir. 1994)); accord Donovan v. Brandel, 736 F.2d 1114, 1116 (6th Cir. 1984).

> Normally, a judge will be able to make this determination [whether "employee" or "independent contractor"] as a matter of law. However, where there is a genuine issue of fact or conflicting inferences can be drawn from the undisputed facts, ...the question is to be resolved by the finder of fact in accordance with the appropriate rules of law."

Lilley v. BTM Corp., 958 F.2d 746, 750 n.1 (6th Cir. 1992). If this Court can determine whether

_____

[6] Defendants conflate the standards for showing an absence of "willfulness" and "good faith." (Doc. No. 137 at 16-20). The standards are distinct, and the issues of willfulness and good faith will be addressed separately in this Order.

-18-

Plaintiffs were employees or independent contractors on the basis of the undisputed facts and the necessary inferences arising therefrom, then resolution of this issue is proper at the summary judgment stage.

Under the FLSA, an "employee" is "any individual employed by an employer," 29 U.S.C. § 203(e)(1), to "employ" is "to suffer or permit to work," id. § 203(g), and an "employer" is "any person acting directly or indirectly in the interest of an employer in relation to an employee." Id. § 203(d). Being circular, these definitions provide little guidance for determining whether an employment relationship exists.

Instead, courts use a multi-factor "economic realities" test to determine whether an individual or class of workers are employees or independent contractors. Imars, 1998 WL 598778 at *3; Lilley, 958 F.2d at 750; accord Sec'y of Labor v. Lauritzen, 835 F.2d 1529, 1535 (7th Cir. 1987); Brock v. Superior Care, Inc., 840 F.2d 1054, 1059 (2d. Cir. 1988); Donovan v. DialAmerica Mktg., Inc., 757 F.2d 1376, 1383 (3d Cir. 1985). This balancing test is designed to determine, under the totality of circumstances, whether "the workers depend upon someone else's business for the opportunity to render service or are in business for themselves." Superior Care, 840 F.2d at 1059; accord Imars, 1998 WL 598778 at *3; Lily, 958 F.2d at 750; Brandel, 736 F.2d at 1116.

The factors to be considered under the economic realities test are as follows:

(1)     the permanence of the working relationship between the parties;

(2)     the degree of skill the work entails;

(3)     the extent of the worker's investment in equipment or materials;

(4)     the worker's opportunity for profit or loss;

-19-

(5)     the degree of the alleged employer's control over the worker;

(6)     whether the service rendered by the worker is an integral part of the alleged

        employer's business.

Imars, 1998 WL 598778 at *3; Brandel, 736 F.2d at 1117.

In Brandel, the Sixth Circuit "inverted" the sixth factor to ask whether the workers were

economically dependent upon the business for which they were laboring. 736 F.2d at 1120; see

Imars, 1998 WL 598778 at *3 (characterizing its earlier treatment of the sixth factor in Brandel

as an inversion). In answering that question, the Sixth Circuit looked to other factors, such as (a)

whether the worker was subjected to long hours at low wages; (b) whether similar work was

available elsewhere; and (c) whether the alleged employer unilaterally controlled the rate of pay.

Brandel, 763 F.2d at 1120. Other circuits have endorsed similar inquiries under the heading of a

separate, seventh factor. See, e.g., Sec'y of Labor v. Lauritzen, 835 F.2d 1529, 1538 (7th Cir.

1987); see also, Usery v. Pilgrim Equip. Co., 527 F.2d 1308, 1311-12 (5th Cir. 1976); Donovan

v. DialAmerica Mktg., Inc., 757 F.2d 1376, 1385 (3d. Cir. 1985). Others still have simply held

that the six factors are not exclusive as listed, and that courts may consider any relevant facts

under the totality of the circumstances. Superior Care, 840 F.2d at 1058.

All courts that have dealt with the issue are in agreement, however, that one factor does

not control: "explicit contractual arrangements." Imars, 1998 WL 598778 at *4; accord

Rutherford Food Corp. v. McComb, 331 U.S. 722, 729 (1947) ("[w]here the work done, in its

essence, follows the usual path of an employee, putting on an 'independent contractor' label does

not take the worker from the protection of the Act"); Robicheaux v. Radcliffe Material, Inc., 697

F.2d 662, 667 (5th Cir. 1983) ("[a]n employee is not permitted to waive employee status"). As

-20-

the Sixth Circuit noted, the reason for looking past contractual arrangements "is simple: 'The FLSA is designed to defeat rather than implement contractual arrangements'" in as much as the Act represents a repudiation of the freedom of contract principles of <u>Lochner v. New York</u>, 198 U.S. 45 (1905). <u>Imars</u>, 1998 WL 598778 at *4-5 (quoting <u>Lauritzen</u>, 835 F.2d at 1544-45 (Easterbrook, J., concurring)).

Likewise, classifications made by the Tennessee Employment Security Division will not influence the Court's decision. The ESD distinguishes between "employees" and "independent contractors" on the basis of factors distinct from the economic realities test.[7] Moreover, the ESD is not a binding authority on this Court.

The utility of the economic realities test has been questioned in this Circuit. In <u>Imars</u>, the Sixth Circuit wrote that, "few of the factors necessarily makes economic sense, and all of the

---

[7] The Employment Security Division arrives at decisions on the basis of factors listed at T.C.A. § 50-7-207(e). <u>See, e.g.</u>, (Doc. No. 31 Attach. Ex. A). An individual is considered an independent contractor under those factors if:

> (A) Such individual has been and will continue to be free from control and direction in connection with the performance of such service, both under any contract for the performance of service and in fact;
> (B) Such service is performed either outside the usual course of the business for which the service is performed or is performed outside of all the places of business of the enterprise for which the service is performed; and
> (C) Such individual is customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed.

T.C.A. § 50-7-207(e)(1).

There are several critical differences between the economic realities test and the Employment Security Division factors. Notably, factor (A) gives significant weight to the intention of the parties as expressed in contract form. Factor (B) is different in that it places emphasis on where the worker actually performs services for the alleged employer. Most importantly, however, the Employment Security Division's test does not take into account a number of factors under the economic realities test, such as the permanence of the working relationship, the degree of skill of the worker, the opportunity for profit or loss, or the worker's investment in equipment or materials.

-21-

factors are far too easy to manipulate and mold during application to suit a preconceived result."
1998 WL 598778 at *5. The Sixth Circuit is not alone in this regard. In Lauritzen, Judge
Easterbrook of the Seventh Circuit remarked that, "any balancing test begs questions about
which aspects of 'economic reality' matter, and why." 835 F.2d at 1539 (Easterbrook, J.,
concurring). Indeed, it requires only a very cursory view of the economic realities factors to
recognize that they permit of numerous exceptions and may be dubious indicators. For example,
with respect to the permanence of the working relationship, while it is plausible to presume that
employment relationships are more likely to span greater periods of time than independent
contracting ones, which tend to be job specific, it is obvious that a prototypical employment
relationship may be terminated almost as soon as it's begun. The second factor – the degree of
skill involved - is similarly porous; this factor presupposes that a higher degree of skill suggests
independent contractor status, but examples to the contrary are myriad.

 The portent of these difficulties with the economic realities test is that this Court must
proceed with caution in applying it. In keeping with the purpose of the FLSA, to provide
workers with minimum protections against exploitative labor practices, Congress gave the term
"employee" the "broadest definition that has ever been included in any one act." United States
v. Rosenwasser, 323 U.S. 360, 363 n.3 (1945) (internal citation omitted). It is with this
understanding, as well as the overarching question of whether Plaintiffs were reliant on
Defendants or were in business for themselves, that this Court proceeds.

    1.  *Permanence of the Working Relationship*

 Under the permanence prong, the duration of the working relationship is not as
significant as the number of hours worked and the exclusivity of the working arrangement.

-22-

Donovan v. Gillmor, 535 F. Supp 154, 162-63 (D.C. Ohio 1982) appeal dismissed, 708 F.2d 723 (6th Cir. 1982); Lauritzen, 835 F.2d at 1537. This is particularly true where the industry is such that work is partitioned among discrete projects, as here, where LPNs are assigned shifts for individual patients. Gillmore, 535 F. Supp at 162-63; Lauritzen, 835 F.2d at 1537.

Plaintiffs in this case are a somewhat impermanent work force. LPNs are scheduled to work only those shifts which they agree to in advance, and they may accept as many or as few shifts as they choose. About 50% of Defendants' LPNs work less than 40 hours per week, and many simultaneously perform other nursing work. There is variance in the amount of time that LPNs stay with Defendants, but some, following the example of Ms. Wilson, work with Defendants for only a period of weeks. These facts support a finding of transience.

The Court determines that Plaintiffs are a moderately and not highly transient group because approximately half of all LPNs working for Defendants log over 48 hours per week, and many work more. Defendants acknowledge that it is common for LPNs to work between 60 and 80 hours, and Ms. Wilson worked between 80 and 100 hours for the duration of her 10 weeks with On-Call.

Ordinarily, the fact of transience weighs in favor of a determination of independent contractor status. See, e.g., Brandel, 736 F.2d at 1117. However, "even where work forces are transient, the workers have been deemed employees where the lack of permanence is due to operational characteristics intrinsic to the industry rather than to the workers' own business initiative." Brock v. Superior Care, Inc., 840 F.2d 1054, 1060-61 (2d Cir. 1988); accord Brock v. Mr. W. Fireworks, Inc., 814 F.2d 1042, 1053-54 (5th Cir. 1987). In Superior Care, the Second Circuit dealt with the very question before this Court at present, whether LPNs are employees or

-23-

independent contractors under the FLSA.[8] 840 F.2d 1054 (2d. Cir. 1988). In affirming the district court's finding that LPNs are employees, the Second Circuit held that transience is intrinsic to private-duty LPN work, and accordingly gave little weight to the fact of LPN impermanence in its decision. Id. at 1060-61. Defendants' in the present action concede that it is characteristic of nursing work on the LPN level to change companies or work for more than one at a time. (Janice Ayers Dep. at 140:13-24). Indeed, the experience of Ms. Wilson suggests that LPNs are sometimes forced to leave Defendants' company because there is insufficient work or their calls are not returned. As a result, this Court finds that the relative transience of Plaintiffs as a group of workers is to be given little weight; it signals not that Plaintiffs are an enterprising group who successfully brokered their skills for isolated assignments, but rather that the industry does not guarantee steady work with one company for those in need of full-time hours.

### 2. *Degree of Skill*

In evaluating the Plaintiffs' skills under the economic realities test, the Court first notes

---

[8] Defendants argue that Superior Care is inapposite because factually distinct on three (3) grounds: (1) defendants in Superior Care divided their nurses into two groups, one of which was treated like employees and the other like independent contractors, though there was no difference in the work done by the two groups; (2) the contracts between plaintiffs and defendants differed from the ICA; and (3) Superior Care defendants were in the business of health care, whereas Defendants in this action are in the business of staffing. (Doc. No. 154 at 7-10).

 Defendants first contention, while a real factual distinction, does not distinguish Superior Care. The Second Circuit in that case noted that the district court was right to consider the differential treatment between the two groups of nurses in addition to the factors of the economic realities test. Superior Care, 840 F.2d at 1059. However, this fact did not control. As the Appellate Court held, "[a]nalysis of the five economic reality factors fully supports the District Court's conclusion that the nurses are employees." Id.

 Defendants second distinction is without merit. As noted above, the terms of the ICA do not control this Court's determination of whether Plaintiffs were employees or independent contractors.

 Finally, Defendants' third alleged distinction is illusory. Defendants allege that they are solely in the staffing business, whereas the Superior Care defendants were in the business of health care. Apparently, Defendants would have the Court believe that, once assignments are made and schedules are drawn, Defendants wash their hands of the health care afforded clients. The evidence is to the contrary, as discussed below, under the "degree of control" factor. Because Defendants do engage in monitoring the care afforded clients, their third alleged distinction of Superior Care amounts to little more than semantical manipulation.

-24-

that "skills are not the monopoly of independent contractors." Lauritzen, 835 F.2d at 1537. The question under the skills factor is whether the worker's skills are "more like piecework than an enterprise that actually depended for success upon the initiative, judgment or foresight of the typical independent contractor." Rutherford Food Corp. v. McComb, 331 U.S. 722, 730 (1947); Brandel, 736 F.2d at 1118 n.7; Superior Care, Inc., 840 F.2d at 1060 ("[a] variety of skilled workers who do not exercise significant initiative in locating work opportunities have been held to be employees under the FLSA") (citations omitted). It is thus essential to ask whether, in the larger picture, LPNs have the skills necessary to locate and manage discrete work projects characteristic of independent contractors, or whether their skills are of the task-specific, specialized kind that form a piece of a larger enterprise, suggesting employee status.

The Court finds Plaintiffs' skills to be of the latter variety. LPNs must graduate from a one-year nursing program, pass a three (3) hour NCLEX exam, and obtain CPR certification. This training endows LPNs with a moderate base level of skills in nursing procedures. However, LPNs do not have the skills or connections to find their own clients, but rather rely on companies such as Defendants for placements. The fact of reliance upon others for job placements was determinative in Richardson v. Genesee County Community, Mental Health Services., 45 F. Supp.2d. 610, 614 (E.D. Mich. 1999), where the district court determined that RNs were determined to have a skill set more typical of employees. RNs are widely considered to be more skilled than LPNs.

Once placed, LPNs do not budget their time but rather report for shifts as scheduled by a Staffer. They are not permitted to rearrange their schedule on their own, but must instead request that Staffers approve any scheduling changes. On the job, LPNs provide treatment that

-25-

is prescribed by physicians and overseen by RNs; they are the arms, eyes, and ears, but not the organizational or medical "head," of an in-home patient's holistic care. Thus, at every stage in the process, the skill-set of LPNs plays a limiting role, forcing LPNs to rely on the expertise of others while leaving for themselves a narrow, rather mechanized role. In <u>Superior Care</u>, the Second Circuit found these considerations to be dispositive under the skills factor, stating that "[t]he nurses in the present case possess technical skills but nothing in the record reveals that they used these skills in any independent way." 840 F.2d at 1060.

For these reasons, the Court determines that, while Plaintiffs are moderately skilled as a group, their skills are of the kind that weigh in favor of a determination of employee status.

### 3. *Investment in Equipment or Materials*

The Sixth Circuit holds that "[t]he capital investment factor is most significant if it reveals that the worker performs a specialized service that requires a tool or application which he has mastered or that the worker is simply using implements of the landowner [alleged employer] to accomplish the task." <u>Brandel</u>, 736 F.2d at 1118-19. Neither is the case here.

The parties are in agreement that Plaintiffs were required to invest very little of their own resources in equipment or materials. Defendants require that LPNs provide their own uniform, scissors, stethoscope, thermometer, and blood pressure cuff. These items can be purchased for approximately $45 total. Defendants invest slightly more in the hardware that LPNs use in the course of their work, providing the fax machine, ink cartridges, and forms which LPNs use in their daily communications with Defendants. It appears that the most expensive equipment, however, is provided not by the parties to this suit but by the clients themselves; if any sort of specialized medical apparatus becomes necessary for a client's care, it is generally furnished by

-26-

the client's insurance provider. As a result, as in <u>Brandel</u>, this case presents a working environment in which neither Plaintiffs nor Defendants expend considerable resources on the tools of Plaintiffs' trade. 736 F.2d at 1118-19. Accordingly, analysis under this factor offers no insight into the nature of the working relationship between the parties and the Court assigns it no weight.

4.     *Opportunity for Profit or Loss*

The question under the opportunity for profit or loss factor is whether Plaintiffs' earnings were tied to their performance once they accepted work. See <u>Imars</u>, 1998 WL 598778 at *6; <u>Brandel</u>, 736 F.2d at 1119. It is the mark of an independent contractor that a stake in the venture provides both carrot and stick, such that planning, efficiency and skill are rewarded above and beyond the initial contract. <u>Id.</u> Viewed in this light, it is obvious that Plaintiffs had no opportunity for profit or loss; once the work was accepted, Plaintiffs were paid a predetermined rate without regard to their skill, efficiency, or any other variable relative to performance or the circumstances of the client. In analyzing under this factor, the Second Circuit came to the identical conclusion on nearly the same facts. <u>Superior Care</u>, 854 F.2d at 1059 (finding LPNs had no opportunity for profit or loss).

Defendants argue that Plaintiffs did have an opportunity for profit or loss because they were in a position to accept or refuse offers for shifts, negotiate hours and rates of pay, and consider working for multiple companies. (Doc. No. 154 at 13-14). According to Defendants, Plaintiffs' financial status was thus a function of their skill, because, for example, an LPN "accepting a job with a two hour commute . . . could suffer a loss after factoring in transportation and other incidental costs." (<u>Id.</u> at 13). Plaintiffs could profit, Defendants argue, by "hold[ing]

-27-

themselves out to the highest bidder." (Id.).

Defendants' argument proceeds from too great a level of abstraction. Certainly there is a sense in which LPNs may profit or suffer losses based on their decisions in the course of working for defendants, but this is the same sense in which any employee might profit by accepting a high paying job, or suffer loss by accepting a low-paying one or refusing to work altogether. What is significant is whether Plaintiffs had a stake in the venture, and they had none. As a result, the Court finds that the Plaintiffs' inability to profit or suffer loss weighs in favor of an employment relationship.

### 5.    *Degree of Control*

Defendants maintain a high degree of control over LPNs with whom they contract. First, Defendants retain ultimate control over the hours worked by LPNs. LPNs, while not obligated to accept any shifts, can only work those hours approved by Defendants. LPNs who are unable to work shifts as scheduled must notify Defendants, and Defendants must approve any potential shift-swapping or substitution. Additionally, LPNs may be required to work more than the hours scheduled if the next scheduled nurse does not timely relieve the prior one.

Defendants also control the manner in which LPNs conduct their duties while in the homes of patients. The parties dispute the significance of the PPM distributed by Defendants, but even ascribing to the PPM the meaning which Defendants stress, the evidence is overwhelming that Defendants manage and oversee the work of LPNs to a very high degree. From the moment LPNs arrive for a shift, their work is largely pre-determined by Defendants' company policy. LPNs must make an assessment of the client and then proceed with the plan of care outlined in the Form 485. LPNs must make Nurse's Notes hourly, and must also fill out

-28-

forms which correspond with any of a number of procedures which may be performed. LPNs fax documentation to Defendants throughout the course of their shifts, and Defendants, for their part, speak to the clients' families on a near daily basis in addition to reviewing all documentation to check it against the physician's plan of care. Indeed, Defendants are required to conduct this level of oversight because LPNs are not physicians, and so cannot prescribe – but only carry out – medical care.

Defendants argue that because such supervision is mandated by the State or the HHAs with which they contract, it is somehow outside the bounds of this Court's analysis under the economic realities test. (Doc. No. 154 at 11). It is not. What is significant to the determination of an employment versus an independent contractor relationship is that Defendants told Plaintiffs how to do their job.

But Defendants also control the manner in which LPNs conduct themselves as representatives of Defendants' company. Both Defendants' Code of Conduct and periodic memos make clear that LPNs are required to comport themselves in the manner which Defendants' deem proper. LPNs are forbidden from smoking in the homes of clients, sleeping on the job, forming personal relationships with clients or their families, performing personal work on the job, wearing excessive perfume or cologne, and so forth. While many of these rules likely reflect sound judgment, the fact remains that LPNs are not free to exercise discretion on these matters.

Furthermore, it is worth noting that the tone of many of Defendants' memos to Plaintiffs suggests that Defendants believe themselves to exercise control over their LPNs. The memos convey directives in combination with threats, whether blatant or veiled, that are expressed

-29-

harshly and make no effort to restrain Defendants' frustration and condescension.

Defendants argue that they exercised little to no control over Plaintiffs in the course of their work, but instead urged Plaintiffs to make use of their own professional judgment. (Doc. No. 154 at 11-12). This contention is rooted in two (2) sources. First, Defendants rely on the language of the ICA, which specifically denies Defendants the right to oversee or direct LPNs in their work. This language has no bearing on the Court's analysis for the reason noted above, that the FLSA is designed to subvert, rather than enforce, the authority of labor contracts.

Second, Defendants argue that they did not control Plaintiffs insofar as Plaintiffs were free to perform their work in the manner of their choosing. (Doc. No. 154 at 11) (claiming Plaintiffs relied on their "own training and education and not on any direction from On-Call). Contrary to Defendants' claim, the work performed by Plaintiffs on the basis of their training and education was largely formulaic: Plaintiffs performed those tasks which were required by Defendants, either as outlined in a Form 485, as a matter of Defendants' policy, or as the unanticipated circumstances of a particular client might require. What Defendants' contention amounts to is the fact that Plaintiffs were alone in the home with clients without any supervision at the job sight. This is not enough to defeat a finding of control. As the Second Circuit noted in finding that Defendant Superior Care exercised substantial control over its LPN workforce, "[a]n employer does not need to look over his workers' shoulders every day in order to exercise control." Superior Care, 840 F.2d at 1059 (citing Donovan v. DialAmerica Mktg., Inc., 757 F.2d 1376, 1383-84 (3d Cir. 1985)). Where the nature of the industry is such that constant oversight is implausible, the absence of such oversight is not relevant to the control factor of the economic realities test. Id. Because private duty nursing is just such an industry, there is nothing in

-30-

Defendants' arguments to undercut the substantial control which Defendants in fact exercised over Plaintiffs. and the Court finds that this factor weighs heavily in favor of a finding of an employment relationship.

### 6. *Extent to Which Plaintiffs' Services Are Integral*

The work performed by Plaintiffs is at the heart of Defendants' business. Defendants provide nursing services, primarily private duty, and the overwhelming majority of their nurses are LPNs. Under nearly identical circumstances, the Second Circuit found that "the services rendered by the nurses constituted the most integral part of Superior Care's business, which is to provide health care personnel on request." Superior Care, 840 F.2d at 1059-60. Accordingly, the Court finds that this factor weighs in favor of an employment relationship.

### 7. *Economic Dependence*

In Brandel, the Sixth Circuit examined three (3) factors in determining the degree of workers' economic dependence on an alleged employer: (a) whether the worker was subjected to long hours at low wages; (b) whether similar work was available elsewhere; and (c) whether the alleged employer unilaterally controlled the rate of pay. Brandel, 763 F.2d at 1120.

The Court notes that labeling this seventh factor "economic dependence" may result in some confusion. The purpose of the economic realities test is to determine "whether the putative employee is economically dependent upon the principle or is instead in business for himself." Imars v. Contractors Mfg. Servs., Inc., 1998 WL 598778 at *3 (6th Cir. 1998). Lest the seventh factor be understood to swallow or supplant the entire test, it should be understood that, interpreting the Brandel decision, "economic dependence" under the seventh factor refers to the degree that the workers in question are "bound" to their alleged employer. A worker is so bound

-31-

when there is no similar work available elsewhere, or when long hours and low wages –
unilaterally set by the alleged employer – make the liberty to find new work unavailable.

With regard to Plaintiffs, the evidence is mixed under this seventh factor. Plaintiffs were
indeed subjected to long hours, sometimes without their initial consent. Ms. Wilson was forced
to stay on duty for 48 consecutive hours because a replacement nurse did not arrive.
Furthermore, while Defendants have argued that Plaintiffs were in a position to negotiate their
rate of pay, the evidence suggests that negotiation was not especially commonplace, and more
importantly, that negotiation could yield only moderate returns. The upper boundary set by
Defendants was firm at around $25 per hour.

On the other hand, the lower boundary for payment was approximately $18 per hour,
which is by no means a poor hourly wage. Plaintiffs were also free to work for other companies,
and the fact many LPNs do so suggests that work with other nursing agencies is not difficult to
find. It seems, in sum, that Plaintiffs were capable of being periodically trapped into working
long hours for a rate largely determined by Defendants, but that it was economically feasible for
Plaintiffs to leave Defendants and find other work. The Court thus concludes that analysis under
this factor offers no definitive insight into whether Plaintiffs were employees or independent
contractors.

### 8. *Determination of Employment Relationship*

On the basis of the foregoing considerations, the Court determines that Plaintiffs were
employees of Defendants within the meaning of the FLSA. Plaintiffs performed a largely
mechanized function within Defendants' business. They were reliant on Defendants for
placements and scheduling, and their skill set did not permit them to make decisions about the

-32-

care to be given to clients. For their part, Defendants made certain that Plaintiffs provided the care prescribed by a physician in accordance with the procedures approved by HHAs. Plaintiffs did not make any significant investment in equipment or materials, and they had no opportunity for profit or loss in the course of their work for Defendants. Defendants maintained a high degree of control over Plaintiffs, monitoring their work for purposes of State regulations, the wishes of contractual partners, and for their own business goodwill. Finally, Plaintiffs performed the most essential function within Defendants' enterprise: private duty nursing. As a result, the Court concludes that there is no genuine issue of material fact as to whether Plaintiffs were employees or independent contractors. Plaintiffs were employees entitled to the overtime protections of the FLSA.

### B.     Whether Defendant E.L. Garner, III Was an "Employer"

As stated above, an "employer" under the language of the FLSA is "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C.A. § 203(d). The Sixth Circuit has held that "a corporate officer with operational control of a corporation's covered enterprise is an employer along with the corporation, jointly and severally liable under the FLSA for unpaid wages." Dole v. Elliot Travel & Tours, Inc., 942 F.2d 962, 965 (6th Cir. 1991) (internal citations omitted).

Defendants argue that Mr. Garner, III is not an "employer" for purposes of this lawsuit because Mr. Garner, III played no role in the running of Defendants' companies until after initiation of this lawsuit. Plaintiffs argue, to the contrary, that Mr. Garner, III was both owner and president of all On-Call and Guardian Angel entities, and that Mr. Garner, III did in fact assist in running Defendants' business before initiation of this action.

-33-

It is undisputed that Mr. Garner, III is the sole owner and corporate officer of all of Defendants' companies. The question for present purposes is whether he exercised any degree of operational control prior to initiation of the present suit. On this question, there is conflicting evidence. Mr. Garner, III testified that he began work for On-Call in June or July of 2006. However, both he and Mr. Garner swore in affidavits that Mr. Garner, III did not begin work for Defendants until the spring of 2007, after the date this suit commenced. The Court finds this discrepancy to raise a genuine issue of material fact which precludes determination of this issue at the summary judgment stage.

### C.    Whether Good Faith[9]

Section 216(b) of the FLSA authorizes liquidated damages for violation of the overtime provisions of the FLSA. Liquidated damages "are compensation, not a penalty or punishment." McClanahan v. Mathews, 440 F.2d 320, 322-23 (6th Cir. 1971) (quoting Overnight Motor Transp. Co. v. Missel, 316 U.S. 572, 583 (1942)). A district court is permitted to deny an award of liquidated damages "*if and only if*, the employer shows that he acted in good faith and that he had reasonable grounds for believing that he was not violating the Act." Elliott Travel & Tours, 942 F.2d at 967 (quoting Marshall v. Brunner, 668 F.2d 748, 753 (3d Cir. 1982) (emphasis in original)). The two pronged requirement that an employer show both good faith and reasonableness is derived from the FLSA itself. 29 U.S.C.A. § 260. Summary judgment may be proper on the question of liquidated damages as the existence of "good faith" is a matter left to

---

[9] The Court sees no issue in resolving questions of good faith and willfulness while leaving unresolved whether Leawood and Mr. Garner, III are properly made defendants in this action. If the court finds willfulness and an absence of good faith, liquid damages and a three (3) year statute of limitations will extend to defendants. If Leawood and Mr. Garner, III are not proper defendants, then the questions of good faith and willfulness are mooted as to them.

the discretion of the Court.  McClanahan, 440 F.2d at 322.

The burden of establishing good faith for an employer is "substantial."  See, e.g., Elwell v. Univ. Hosps. Home Care Servs., 276 F.3d 832, 836 (6th Cir. 2002); Elliot Travel & Tours, 942 F.2d at 967.  An employer must prove that it took "affirmative steps" to discover the meaning and application of the FLSA to the employer's business.  Martin v. Indiana Michigan Power Co., 381 F.3d 574, 584 (6th Cir. 2004) (quoting Martin v. Cooper Elec. Supply Co., 940 F.2d 896, 908 (3d Cir. 1991)).  Moreover, failure to comply with the FLSA must be based on reasonable grounds; "an employer who negligently misclassifies an employee as exempt is not acting in good faith."  Id.

Defendants in this case have not established good faith.  Mr. Garner met with an attorney in 1984 or 1985 for the purpose of drawing up an enforceable contract for all of the nurses with whom Defendants' company contracted.  The result of that consultation was the ICA, which Mr. Garner was informed would comply with all relevant laws.  Defendants have neither altered nor reassessed the ICA – or for that matter, the legal advice it embodies – in the 20 plus years that Defendants have contracted with nurses.  Additionally, Mr. Garner testified that he was not aware of the existence of the FLSA until the present suit.  In and of itself, the Court finds that this complacency and ignorance of law constitutes negligence sufficient to defeat good faith.  It is inexcusable that a business which hires nearly 1000 nurses and has been operating under various names for over 20 years is in the dark regarding the FLSA and its requirements.  See Indiana Michigan Power, 381 F.3d at 584 ("[t]he employer has an affirmative duty to ascertain and meet the FLSA's requirements"); Elwell, 276 F.3d at 841 (finding that defendant should have requested an opinion from the DOL regarding compliance with the FLSA).

-35-

Defendants argue that, in spite of the minimal affirmative steps taken, Defendants acted reasonably in believing themselves to be in compliance with the law. First, Defendants claim that the lawyer consulted in the mid 1980's was an expert in the field. (Doc. No. 137 at 20). The Court finds this justification to be insufficient. Mr. Garner testified that he was directed to an attorney – whose name he could not recall at the time of deposition – and sought his services exactly once. Defendants never sought a second opinion from an attorney, or even, it would seem, recorded the name and contact information of the attorney for follow-up consultations. Defendants seem instead to have treated compliance with the law as an obligation that could be outsourced for a one-time consulting fee. As a matter of law, this does not constitute affirmative steps, particularly given the fact that no conversation regarding the FLSA ever took place between Defendants and the consulting attorney. See Kinney v. District of Columbia, 994 F.2d 6, 12 (D.C. Cir. 1993) (holding that for consultation with counsel to show "good faith," counsel must have been asked about the applicability of the FLSA to the workers in question); Hultgren v. County of Lancaster, Nebraska, 913 F.2d 498, 509 (8th Cir. 1990) (finding "good faith" because counsel was consulted on the specific question of the FLSA's applicability to the workers in question).

Defendants also argue that they received assurances from other governmental bodies concerning the legality of their labor practices. (Id.). The Tennessee ESD repeatedly denied unemployment benefits to LPNs, deeming them independent contractors, and the DOL Wage and Hour Division notified Defendants that it was unable to classify the relationship between the LPNs and Defendants. As a threshold matter, it is unclear how ESD determinations that LPNs were independent contractors could have reassured Defendants that they were in compliance

-36-

with the FLSA if, as Defendants argue, Defendants were oblivious to the existence of the FLSA until initiation of this lawsuit. However, putting this point aside, the determinations of the ESD are not significant for FLSA purposes, and Defendants would have known this had they taken affirmative steps to discover the legality of their hiring practices under the FLSA.

As far as the notification which Defendants received from the Wage and Hour Division is concerned, notification was received by Defendants after initiation of this lawsuit. As a result, this notification can have no bearing on whether Defendants acted in good faith during a time period that preceded this action.

For these reasons, Defendants have failed to meet their burden of establishing good faith, and thus liquid damages are mandated under the FLSA for violations of § 207.

### D.      Whether Willful Violation

Finally, Defendants contend that a two (2) year statute of limitations is appropriate in this case because any violations of the FLSA were not "willful." Where violation of the FLSA is "willful" a three (3) rather than two (2) year statute of limitations applies. 29 U.S.C.A. § 255(a); McLaughlin v. Richland Shoe Co., 486 U.S. 128, 135 (1988); Elliot Travel & Tours, 942 F.2d at 966. The party alleging willfulness bears the burden of proof "that the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by statute." Richland Shoe, 486 U.S. 128, 133 (1988) (quoting Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 127 (1985)). To make out recklessness, the moving party may satisfy its burden by showing that the "employer disregarded the very 'possibility' that it was violating the statute." Alvarez v. IBP, Inc., 339 F.3d 894, 908-09 (9th Cir. 2003); accord Herman v. RSR Sec. Servs. Ltd., 172 F.3d 132, 141 (2d Cir. 1999). The determination of "willfullness" for purposes of §

255(a) is an appropriate issue for decision by the Court on summary judgment. See Herman v. Palo Group Foster Home, Inc., 183 F.3d 468, 472 (6th Cir. 1999) (approving finding of willfulness by the district court).

Defendants in this case showed reckless disregard to the possibility that their conduct was unlawful under the FLSA. In 2005, Defendants entered into an agreement with Friendship in which Defendants purchased 50% of Friendship and agreed to take over payment of Friendship's nursing staff. Friendship was sued by the Department of Labor for failure to pay overtime to its nurses, and Friendship settled that case and issued backpay to its nursing staff. This was going on at exactly the time Defendants entered into the agreement with Friendship, and Defendant Mr. Garner was aware of that fact. According to his testimony, Mr. Garner asked Mr. Egbujor, the Friendship CEO, "if I get ready to exercise and if I'm able to exercise the option to buy 50 percent of your company, Friendship, there are no liens or any lawsuits out there, are there?" (Depo. of Lee Garner at 51). Mr. Garner was informed by Mr. Egbujor that Friendship had indeed been sued by the DOL, but Mr. Egbujor assured Mr. Garner that the matter would be resolved by year's end and was, in any event, of no concern. Mr. Garner asked no further questions and received no further information on the subject.

The Court finds that the above evidence establishes Defendants' recklessness. Defendants were planning to take over the payment of Friendship's nurses, as well as a significant ownership share in the company. Defendants should have inquired what payment practices of Friendship had triggered suit by the DOL, lest Defendants commit the same mistake or unwittingly assume a portion of Friendship's liability. Herman v. RSR Sec. Servs. Ltd., 172 F.3d 132, 142 (2d Cir. 1999) (finding recklessness where defendant company turned a blind eye

-38-

towards the FLSA violations of a company that defendants took over). Defendants recklessly relied on the passing assurances of a man whose company had been sued by the DOL, which suit led to a settlement agreement. See Herman v. RSR Sec. Servs. Ltd., 172 F.3d 132, 142 (2d Cir. 1999) (finding recklessness where defendant relied on the assurances of someone defendant knew to have been investigated and successfully sued by the Internal Revenue Service). Moreover, Defendants chose to rest on the validity of a labor contract drawn up approximately 20 years prior. In this regard, Defendants' conduct went well beyond negligence into willful ignorance.

Furthermore, while Defendants maintain that they had no awareness of the applicability of the FLSA to their company until the initiation of the present lawsuit, Defendants certainly understood some legal distinction between employees and independent contractors because Defendants hired both under separate contracts. A small number of Defendants' nurses, and all of Defendants' office personnel, were treated as employees, whereas the majority of nurses were treated differently under the ICA. If Defendants, in fact, were unaware of the relevant legal distinction between these two classes of workers, and merely relied on the advice of legal counsel dating back to the mid-1980's, again, this constitutes willful ignorance of the law. Defendant Mr. Garner was in the business of providing private duty nursing for over 20 years. Many competing businesses, including HHAs, paid overtime to their nurses during this time. Indeed, Defendant Mr. Garner, III stated that he was almost certain that one of Mr. Garner's earlier businesses had paid its nurses overtime.

In this light, Defendant's ignorance of the law is more than negligent – it is reckless indifference to the possibility of violation of the FLSA. As a result, under § 255(a) of the FLSA,

-39-

a three (3) year statute of limitations is appropriate.

IV.     CONCLUSION

For the foregoing reasons, the Court determines: (1) that Plaintiffs were "employees" under the meaning of the FLSA; (2) that there is an issue of genuine material fact as to whether Defendant E.L. Garner, III, was an "employer" under the Act, precluding summary judgment on that question; (3) that Defendants' conduct was not in good faith, such that liquidated damages are mandated; and (4) that Defendants' conduct was willful, such that a three (3) year statute of limitations is proper.

Accordingly, Defendants' Motion for Summary Judgment is **DENIED** and Plaintiffs' Motion for Partial Summary Judgment is **AFFIRMED in part**.

It is so ORDERED.

Entered this __31__ day of July, 2008.


JOHN T. NIXON, SENIOR JUDGE
UNITED STATES DISTRICT COURT

-40-